IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KEVIN C. MORGAN, | : |
| | : |
| Plaintiff, | : Case No. 2:17-cv-829 |
| | : |
| v. | : CHIEF JUDGE ALGENON L. MARBLEY |
| | : |
| CITY OF COLUMBUS, OHIO, *et al.* | : Magistrate Judge Deavers |
| | : |
| | : |
| Defendants. | : |

**OPINION & ORDER**

This matter is before the Court on Defendants' City of Columbus, Ohio and Kimberley Jacobs Motion for Summary Judgment. (ECF No. 20). For the following reasons, Defendants' Motion is **DENIED.**

**I. FACTUAL BACKGROUND**

**A. Termination of Officer Morgan**

Plaintiff Kevin Morgan was a police officer with the Columbus Police Department ("CPD") from July 2002 to September 1, 2015. (Morgan Dep. 13:15-21). Officer Morgan is Black, and brings this lawsuit alleging he was disciplined more harshly than similarly situated white officers. (ECF No. 3).

During his employment, Officer Morgan engaged in several "special duty" activities, in which he performed police duties for private businesses and property owners. (Morgan Dep. 28:13-23). One of his assignments was at the Stratford Lake complex, where he began working in early 2013. (Morgan Dep. 44:22-45:5). The coordinating officer for special duty activities, Tony Roberts, asked Morgan to work at Stratford Lakes on Wednesdays, and Morgan

1

understood that he could work on different days depending on family obligations. (Morgan Dep. 49:1-10). At first, Morgan would notify Roberts when he needed to switch shifts. (Morgan Dep. 67:1-20). Roberts stated that the reporting was an honor system, in which each officer was responsible to work the shift they were scheduled. (Morgan Dep. Ex. 1 at 12). Roberts would submit an invoice on behalf of the officer once a shift took place unless he was notified of a change. (*Id.*).

At a certain point, Morgan stopped notifying Roberts of his shift changes by text message. (Morgan Dep. 84:2-85:6). He also failed to "mark in service"—notify the CPD radio room of the start of his special duty shifts—on a number of occasions. (Morgan Dep. 136:14-137:6). On November 6, 2013, the property manager of Stratford Lakes, Ms. Williams, contacted Officer Roberts saying she was looking for Morgan on his regular Wednesday shift but could not find him. (Morgan Dep. Ex. 1 at 11). Then on November 8, 2013, Officer Roberts messaged Morgan informing him that Stratford Lakes management no longer wanted Morgan working as a special duty officer and removed him from the schedule. (Morgan Dep. 85:10-21). Morgan was relieved of duty and assigned to the administrative officer of CPD, where he remained until he was terminated almost two years later. (Jacobs Dep. 79:15-80:8, 82:9-13). At the time of Morgan's termination, he had no record of disciplinary actions on file. (Morgan Dep. 164:19-20; Morgan Dep. Ex. 23 at 14).

CPD began with a criminal inquiry into Morgan's conduct. Ms. Williams said she did not want to press charges. (Bond Dep. 53:7-12). She also reported she had wanted officers to vary their hours. (Jacobs Dep. 101:2-9; Meister Dep. 39:11-17; Morgan Dep. Ex. 42 at 1). The assistant county prosecutor declined to prosecute, nothing there were serious challenges of proof, "including the fact that Ms. Williams had wanted the officers to vary their shifts, that the record-

keeping for the job was not reliable, and that there was no way to disprove any claim by Officer Morgan that he had, in fact, worked other days and hours than his regular Wednesday evening shift." (ECF No. 25 at 12) (Jacobs Dep. 100:15-101:9; Morgan Dep. Ex. 11, 42).

After the conclusion of the criminal inquiry, CPD began an internal disciplinary investigation by Sergeants Raymond Meister and Kenneth Decker. At this point, nearly a year after the events, Officer Morgan was having difficulty remembering which shifts he had switched or completed. (Morgan Dep. 171:15-172:8, 174:2-175:18; Decker Dep. 35:19-36:23; Meister Dep. 91:3-92:16). Sgt. Decker and Officer Morgan's union counsel both suggested requesting radio logs for the time period in question, but Sgt. Meister never did this. (Meister Dep. 130:21-131:24; Morgan Dep. Ex. 15 at 33-35). Morgan also provided descriptions of witnesses who might have been able to verify his regular work at Stratford Lakes. (Morgan Dep. Ex. 14 at 15). While Meister spoke to one witness, a security officer named Corporal Kyle DeGoey, Meister testified that there were no other witnesses to talk to when he went to search for them based on Morgan's descriptions. (Meister Dep. 66:16-68:7). Decker and Meister also asked about a conversation between Morgan and Roberts regarding who Roberts could speak with to confirm Morgan was working at Stratford Lakes, but Decker did not make an effort to identify the witnesses (Decker Dep. 60:8-61:17).

When an officer denies misconduct and there is no documentation disproving the denial, the investigation is typically concluded as "not sustained." (Jacobs Dep. 114:21-115:21; Speaks Dep. 73:24-74:5; Meister Dep. 65:23-66:15, 147:7-20). Here, Meister recommended sustaining the allegations that Morgan did not report for duty for eleven (11) entire shifts and five (5) partial shifts at Stratford Lakes. (Morgan Dep. Ex. 1 at 66-74). The investigation report was sent up the chain to Deputy Kuebler and then to Chief Jacobs. Jacobs added a handwritten Rule 1.04 "cause

3

for dismissal" charge, which if sustained, automatically results in termination. (Jacobs Dep. 97:1-98:12). Jacobs testified she could only remember one other similar case where she had done this, but records in that case showed there was already a Rule 1.04 against the officer. (Jacobs Dep. 98:19-99:20; Vardaro Decl. Ex. 1). After a hearing, Jacobs concluded Morgan should be suspended for six weeks and terminated. (Jacobs Dep. 183:13-184:10). Director Speaks upheld this recommendation. (Morgan Dep. Ex. 20; Morgan Dep. Ex. 23).

### B. CPD's Treatment of White Officers

White officers were also found to have committed "time infractions," but their alleged offenses were considered more serious given their higher rank and the greater number of hours of work they missed. (Jacobs Dep. 47:3-17; Speaks Dep. 50:13-24, 127:23-129:5; Kuebler Dep. 119:18-120:13). The white officers who were charged with similar types of offenses were allowed to continue working and were not relieved of duty while they were being investigated, while Morgan had to surrender his firearm and badge. (Morgan Dep. 14:6-16, 165:18-166:14). Bronson Constable and Doug Jones were white sergeants who failed to report to work on multiple occasions and were recommended for departmental charges but were not terminated. (Jones Dep. 189:1-21).

An internal investigation report from May 8, 2015 showed that Sgt. Constable was not at work for 19 days over a two-year period, and 152 hours were not deducted from his leave banks. (Jacobs Dep. 188:1-189:11, 190:20-191:9; Morgan Dep. Ex. 6 at 50). Sgt. Constable was also found to be absent without leave for many shifts, and only submitted notice of leave slips after his supervisor Lt. Spears informed him that he had not requested permission for these unexcused absences. (Morgan Dep. Ex. 6 at 6-7, 51-52). The same internal investigation sustained that Sgt. Jones was not at work for 23 days, and 184 hours of shifts were not deducted from his leave

4

banks. (Jacobs Dep. 188:1-189:11; Morgan Dep. Ex. 6 at 54). The investigation reported that Sgt. Jones did not submit leave slips but still took time off from work. (Morgan Dep. Ex. 6 at 55). Compared to Morgan, Director Speaks testified that Sgts. Constable and Jones' infractions were "more egregious" in terms of the hours the sergeants were paid for without working. (Speaks Dep. 128:8-23). While Deputy Chief Kuebler recommended to Chief Jacobs that both Sgts. Constable and Jones be terminated, Jacobs issued Sgts. Constable and Jones each 240 hours (six weeks) of suspension. (Kuebler Dep. 118:10-119:17; Jacobs Dep. 219:12-18). Chief Jacobs testified that this penalty resulted from Sgts. Constable and Jones's union's strong advocacy for their cases and Prosecutor Jeff Blake's letter declining prosecution. (Jacobs Dep. 213:3-14; Morgan Stipulated Ex. 3).

Chief Jacobs and Director Speaks both considered the allegations against Sgts. Constable and Jones and Officer Morgan as claiming pay for hours without having worked. Whether it was pay from regular shifts funded by taxpayers or pay from special duty activities funded by private employers, Chief Jacobs and Director Speaks considered the misrepresentation of time worked as the most relevant issue. (Jacobs 194:18-195:4; Speaks Dep. 118:15-24, 128:5-7). Chief Jacobs also testified he was aware that Constable had prior disciplinary actions as a result of having been found untruthful in an internal investigation. (Jacobs Dep. 207:23-208:2). Jones similarly came forward admitting untruthful conduct, producing leave slips for each absence he had not requested leave for after the fact. (Jacobs Dep. 197:2-198:13).

Besides Sgts. Constable and Jones, there is evidence that other white officers were found to have knowingly received pay for absences without leave but were not terminated. Officer Zane Kirby admitted to lying to a superior about working from home when he in fact took leave without permission. (Jacobs Dep. 230:21- 232:14). Chief Jacobs only issued a total of 48 hours

5

of suspension on Kirby and did not sustain the charge of untruthfulness, despite Morgan's case being discussed as "an example with similar rule violation." (Jacobs 239:10-240:12). Officer David LaRoche falsely claimed he submitted leave slips for the time he actually cut his shifts short or started them late, which was found to be deliberate misconduct. (Vardaro Decl. Ex. 3 at 13). LaRoche was offered forfeiture of accrued leave instead of being terminated even though Chief Jacobs admitted that LaRoche's case would be a potential comparable to Morgan's. (Vardaro Decl. Ex. 3 at 1; Jacobs Dep. 254:10-255:5). Finally, Decker sustained theft of time allegations against Officer Brett Slaughter, whose keycard logs showed he would often not be present at his assigned post for "a great deal of time" for a yearlong period (Jacobs Dep. 257:6-258:24; Decker Dep. 87:16-88:14; Vardaro Decl. Ex. 4 at 12-13). Officer Slaughter's confirmed instances of missed work and the number of working hours falsely claimed still exceeded the instances and hours sustained against Morgan. (Vardaro Decl. Ex. 4 at 16-23). Ultimately, Officer Slaughter accepted leave forfeiture, without being terminated. (*Id.* at 1-3).

## II.     PROCEDURAL BACKGROUND

Plaintiff Morgan originally filed suit in the Franklin County Court of Common Pleas on August 28, 2017, alleging Defendants discriminated against him on the basis of race in employment under 42 U.S.C. § 1981, Ohio Rev. Code § 4112.02, and the Equal Protection Clause. (ECF No. 3). On September 20, 2017, Defendants removed the case to federal court. (ECF No. 1). After a lengthy discovery process, Defendants filed this Motion for Summary Judgment on October 31, 2019. (ECF No. 20). Plaintiff filed his Response in Opposition to the motion on December 13, 2019 and Defendants filed their Reply on January 6, 2020. (ECF Nos. 25, 26). Defendants' Motion for Summary Judgment is now ripe for review.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).

A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). It is proper to enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477

7

U.S. 317, 322 (1986). Where the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Id.* (quoting *Anderson*, 477 U.S. at 250).

### IV. LAW & ANALYSIS

#### A. Race discrimination claims

Morgan brings race discrimination in employment claims under 42 U.S.C. § 1981 and Ohio Rev. Code § 4112.02, as well the Equal Protection Clause pursuant to 42 U.S.C. § 1983. The Court analyzes these claims together under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). 42 U.S.C. § 1981 provides the "same right… to make and enforce contracts… as is enjoyed by white citizens." Ohio Rev. Code § 4112.02 (A) prohibits employment discrimination, including discharge, "because of the race."[1] The Sixth Circuit has found, "federal case law interpreting Title VII… is generally applicable to cases involving alleged violations of [Ohio Rev. Code] Chapter 4112." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)). The Court also "review[s] claims of alleged race discrimination brought under § 1981… under the same standards as claims for race discrimination brought under Title VII." *Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999)). Likewise, "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to

---

[1] "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A).

recover on an equal protection claim under section 1983." *Id.* (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.1988)).

Title VII prohibits employers from "fail[ing] or refus[ing] to hire or [] discharge[ing] any individual, or otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the *McDonnell Douglas* burden-shifting framework, Plaintiff has the initial burden of establishing a prima facie case of race discrimination. *McDonnell Douglas Corp.* 411 U.S. at 792. Plaintiff has not put forward direct evidence of discriminatory intent, so he can make out a prima facie case by demonstrating that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) he was treated less favorably than similarly situated employees of a different race. *See, e.g., Crowder v. Railcrew Xpress*, 557 Fed. Appx. 487, 494-95 (6th Cir. 2014); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000). Once Plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. Plaintiff then bears the ultimate burden of showing Defendants' non-discriminatory reason is merely pretext. *Id.* at 804.

There is no question that: (1) Morgan is a member of a protected class; or (2) that he suffered an adverse employment action when he was terminated from CPD. The question is whether Morgan was terminated because of his race. Defendants do not challenge the prima facie case in their Motion. (ECF No. 20 at 9). Rather, they maintain that Morgan has not met his burden to show pretext. Defendants argue Morgan was fired for performance reasons, while

9

Morgan maintains similarly situated white employees received lesser disciplinary action for more egregious violations.

A plaintiff can demonstrate pretext by "showing that the employer's stated reason for adverse employment action either (1) has no basis in fact, (2) was not the actual reason or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392-93 (6th Cir. 2008). Morgan does not dispute the factual basis of the non-discriminatory reason, but can still show the reason is insufficient—and therefore pretextual—with evidence that "employees outside the protected class [] were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Moffat v. Wal-Mart Stores, Inc.*, 624 Fed. Appx. 341, 347 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 349 (6th Cir.2012)). Thus, when "an employer argues that the plaintiff's differential discipline was justified by material differences in context, [the court] evaluates whether that justification is pretextual by looking to the same or similar factors as when evaluating the 'similarly situated' element of the prima facie case." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016)).

The Court finds that Defendants have not met their burden of showing there are no disputed material facts as to pretextual nature of their alleged non-discriminatory reason for terminating Morgan. Defendants maintain Morgan cannot show there are any "similarly situated" white employees because the white officers Morgan compares himself to were not charged with violations of the same rules. (ECF No. 20 at 13). Defendants characterize the comparators as "fail[ing] to properly submit leave slips for time away from their job" while Morgan "falsely claimed to be working a special duty job." (*Id.*). However, Defendants gloss over the evidence supporting the seriousness of the offenses of the alleged comparators and erroneously conclude

10

the fact that the white officers were not charged with the same exact rule violations supports summary judgment in their favor. As Plaintiff argues in response, the proper inquiry is the level of "'comparable seriousness,' not comparable rule numbers." (ECF No. 25 at 6) (citing *Jackson*, 814 F.3d at 777 (6th Cir. 2016)).

This Court has held that "[t]he issue is not… whether "similarly situated" employees violated the exact same rule, but "whether the white employees were engaged in acts of comparable seriousness." *Jules v. Vill. of Obetz Police Dep't*, No. 2:11-CV-582, 2013 WL 4832893, at *6 (S.D. Ohio Sept. 11, 2013) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 586 (6th Cir. 1992)). Likewise, the Sixth circuit has held "[a] plaintiff is not required to show that his proposed comparator's actions were identical to his own." *Jackson*, 814 F.3d at 777 (quoting *Colvin v. Veterans Admin. Med. Ctr.*, 390 Fed. Appx. 454, 459 (6th Cir. 2010)). Among the comparators are Sgts. Constable and Jones, who were disciplined less harshly for failing to report more hours. (Speaks Dep. 128:8-23). While Defendants are correct that Constable and Jones were ranked higher than Morgan, this fact also lends itself to the perceived seriousness of their offenses. (Jacobs Dep. 47:3-17; Speaks Dep. 50:13-24, 127:23-129:5; Kuebler Dep. 119:18-120:13). In support of his argument that their offenses were at least as serious, Morgan points to Constable's disciplinary history and Jones's admitted untruthfulness in the investigation. (Jacobs Dep. 197:2-198:13, 207:23-208:2).

The Court finds unpersuasive Defendants attempt to distinguish Morgan's failure to report to his special duty assignment from other officers' misrepresentations about time worked on their regular duty shifts. Chief Jacobs and Director Speaks testified that they considered the misrepresentation of time worked as the most relevant issue to Morgan's discipline. (Jacobs 194:18-195:4; Speaks Dep. 118:15-24, 128:5-7). Viewing the facts in the light most favorable to

11

Morgan, the white officers' infractions for misrepresenting their hours in various contexts could be construed as equally serious. The Court finds that "[a] jury could infer that Defendants' decision to take the drastic disciplinary action of termination" for failing to report shift changes when they had "never…previously disciplined [Morgan] for the same conduct, was a pretextual reason for [Morgan's] termination." *Jules*, 2013 WL 4832893, at *7.

The Court finds the record demonstrates a genuine issue of material fact as to whether the white officers' conduct was at least as serious as Morgan's. Defendants have not conclusively demonstrated that the white officers' conduct was less serious, merely alleged that they were not charged with the same rule violations and that they had different supervisors. Such distinctions are insufficient to disprove pretext. *See Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 441 (6th Cir. 2002) (genuine issue of material fact existed as to whether defendants' decision to hire white applicants was pretextual, given their "non-discriminatory reason was vague" and they "failed to specify the manner in which the white employees were better qualified"). The Court concludes a reasonable jury could support an inference of pretext on the facts that white officers were disciplined less harshly for comparable conduct. *Jules*, 2013 WL 4832893, at *7. *See also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008) (finding a reasonable jury could infer pretext on the facts that plaintiff possessed some qualifications for a position that the comparator did not).

### B. Liability

#### 1. Section 1981

Defendants argue they are entitled to summary judgment on Plaintiff's Section 1981 claim because the statute does not permit suit against state actors or municipalities. (ECF No. 20 at 6) (citing *McCormick v. Miami Univ.*, 693 F.3d 654, 659-60 (6th Cir. 2012) ("a plaintiff

cannot use § 1981 to sue a state actor in his or her official capacity"); *Arendale v. City of Memphis*, 519 F.3d 587, 598-99 (6th Cir. 2008) ("no independent cause of action against municipalities is created by § 1981(c)")).

Plaintiff responds that he is not bringing a freestanding or independent Section 1981 claim, which he admits would be impermissible under the case law, but that "Plaintiff's constitutional claim under the equal protection clause and his race discrimination claim under Section 1981 are considered together using the Section 1983 rubric, under which individual liability for Chief Jacobs is subject to qualified immunity analysis, while municipal liability for the City is determined based on the application of *Monell*." (ECF No. 25 at 31-32).

The case law makes clear that Section 1981 does not provide a *broader* remedy for damages against state actors than Section 1983, but permits Plaintiff to vindicate his Section 1981 rights via the Section 1983 damages framework. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) ("Section 1983 provides an explicit remedy in damages which, with its limitations on municipal liability, Congress thought 'suitable to carry ... into effect' the rights guaranteed by § 1981 as against state actors"). Plaintiff acknowledges he is not bringing a standalone Section 1981 claim but is seeking to hold governmental officials and municipalities liable under the Section 1983 rubric, which the case law clearly permits. (ECF No. 25 at 31-32). *See McCormick*, 693 F.3d at 661 ("[w]hether the violation of § 1981 is committed by a municipality through its policies or custom, or individuals acting under the color of state law, § 1983 contains an express clause permitting an aggrieved person to sue the state actor for money damages"). Therefore, the Court analyzes Plaintiff's claims against the police chief pursuant to qualified immunity analysis and the claims against the City of Columbus pursuant to the *Monell* framework for municipal liability.

### 2. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014).

Defendants argue Chief Jacobs is entitled to qualified immunity because Chief Jacobs "does not have a final determination in Morgan's employment," but "simply makes a recommendation to the Director of Public Safety who then holds a hearing and makes an independent determination." (ECF No. 20 at 16). In one sentence, Defendants also claim Morgan's rights were not clearly established, but make no arguments supporting this assertion. (*Id.*). The Court finds the constitutional and statutory prohibitions on race discrimination in employment were clearly established at the time of Morgan's termination. *See, e.g., Williams v. Richland County Children Services*, 489 Fed. Appx. 848, 854 (6th Cir. 2012) ("If any 'right' under federal law is 'clearly established,' it is the constitutional right to be free from racial discrimination. Not only is this obligation 'clearly established,' but it is evident from the face of the statute [Section 1981] under which Williams brought her claim."); *Fairman v. Konteh*, 361 F. Supp. 2d 704, 709 (N.D. Ohio 2005) ("the right not to be terminated because of race is clearly established").

Rather than argue the right to be free from race discrimination in employment is not clearly established, Defendants' qualified immunity argument focuses on Chief Jacobs's role in Morgan's termination. They argue Safety Director Speaks, not Chief Jacobs, was the final decision-maker, and Jacobs is thus entitled to qualified immunity. (ECF No. 20 at 15-16). However, the Sixth Circuit has held "an influential recommender can be liable under § 1983

without being the final decisionmaker, if the recommendations are shown to be sufficiently influential." *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (6th Cir. 1999) (citing *Adkins v. Board of Educ.*, 982 F.2d 952 (6th Cir.1993)). Director Speaks testified that while it wasn't a "foregone conclusion" he would agree with the Chief's recommendation, he "had great respect for the chiefs" and "would have given [their decisions] weight." (Speaks Dep. 42:19-23). He also testified that he could not recall any situation in which he decided to terminate an officer when Jacobs recommended lesser discipline. (Speaks Dep. 169:4-9).

The Court finds the record contains sufficient evidence as to the influence of Chief Jacobs's recommendation in order to survive summary judgement. There is ample evidence that Chief Jacobs was an influential recommender in Officer Morgan's termination. A police chief's "supervisory position and expertise in police matters could have rendered [her] opinion about the need to terminate [plaintiff] highly influential." *Sigler v. City of Englewood*, No. 3:07CV092, 2008 WL 4448978, at *14 (S.D. Ohio Aug. 19, 2008), report and recommendation adopted in part, rejected in part, No. 307CV092, 2008 WL 4448977 (S.D. Ohio Sept. 29, 2008). At the very least, there is a genuine issue of material fact as to the level of Jacobs's influence sufficient to defeat summary judgment on Defendants' qualified immunity claim. *See Stinebaugh v. City of Wapakoneta*, 630 Fed. Appx. 522, 530 n.2 (6th Cir. 2015) (denying summary judgment to fire chief, despite the city safety director's final say in the plaintiff's termination, because "a reasonable jury could find that [the chief] played an influential role in [plaintiff's] demotion and termination").

### 3. Municipal liability

The Supreme Court in *Monell v. Department of Social Services of City of New York* held that § 1983 imposes liability on a municipality when an employee acts "under color of some

15

official policy" thereby causing a violation of another's constitutional rights. 436 U.S. 658, 692 (1978).

Defendants argue "there is simply no municipal policy at issue" in this case, and therefore the city cannot be held liable under Section 1983. (ECF No. 20 at 15). But *Monell*'s "requirement that a municipality's wrongful actions be a 'policy' is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials. It is meant to distinguish those injuries for which 'the government as an entity is responsible under § 1983' from those injuries for which the government should not be held accountable." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994) (quoting *Monell*, 436 U.S. at 694)).

In addition to (1) "legislative enactments or official agency policies," a plaintiff can look to: "(2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations" as evidence of a policy or custom sufficient for municipal liability. *Red Zone 12 LLC v. City of Columbus*, 758 Fed. Appx. 508, 515 (6th Cir. 2019) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). The City of Columbus can thus be liable for an isolated instance of discharge if the discharge decision "was made or approved by a final policy-maker of the City." *Meyers*, 14 F.3d at 117. This includes "a subordinate's decision… if ratified by an authorized policymaker." *Lentz v. City of Cleveland*, 333 Fed. Appx. 42, 47 (6th Cir. 2009) (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993)). Plaintiff may also be able to show "a custom of tolerance or acquiescence of federal rights violations" by demonstrating a practice of disciplining white officers less severely for similar offenses. *Red Zone 12*, 758 Fed. Appx. at 515.

The Court finds Defendants have not met their burden of showing there is no genuine issue of material fact regarding municipal liability under either of these theories. Morgan's termination was recommended by Chief Jacobs and ratified by Director Speaks. It is at least a disputed material fact that Morgan's termination was an "action[] taken by officials with final decision-making authority." *Red Zone 12 LLC*, 758 Fed. Appx. At 515. Morgan also alleges CPD has a practice of disciplining white officers less severely for similar or more egregious conduct, which could amount to a "tolerance or acquiesce of federal rights violations." *Id.* This is sufficient to survive summary judgment on municipal liability under *Monell*.

### C. Spoliation

Finally, Defendants seek summary judgment against Plaintiff as a sanction for alleged spoliation by Plaintiff. (ECF No. 20 at 13). Defendants allege that Morgan destroyed a hard copy of a calendar that showed when he was working special duty jobs for the year 2013. (*Id.*) Defendants allege that this calendar is relevant to the question of whether Plaintiff was present at his workplace because he told Chief Jacobs that the calendar would show when he was at work. (*Id.* at 14). They argue that Morgan "had control over his personal calendar," which he had access to as late as May 21, 2015, and he destroyed it with a "culpable mental state." (*Id.* at 13-14).

Plaintiff opposes Defendants' conclusions from the record, arguing that Defendants have "cherry-picked testimony." (ECF No. 25 at 36). Plaintiff explains in his deposition that he incorrectly believed he still had this calendar during both his investigative interviews in September 2014 and his hearing with the chief in May 2015. (*Id.* at 36-37). When Chief Jacobs asked Morgan to search for this calendar, Morgan testified that he could no longer find it and realized he did not know what happened to the calendar. (Morgan Dep. 148:17-149:17).

17

The Sixth Circuit has held that "a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc). This discretion includes imposing sanctions such as "dismissing a case" or "granting summary judgment" for the moving party. *Id*. at 653. In order for this Court to determine whether sanctions for spoliation are appropriate, "a party seeking an adverse inference instruction based on the destruction of evidence must establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). Applying these factors, this Court finds that the Defendants have not furnished evidence to justify sanctions for spoliation.

As to the first element, control and obligation to preserve, the Defendants have not provided sufficient evidence to show that Morgan had an obligation to preserve the calendar. In their Motion for Summary Judgment, Defendants only argue that "Morgan had control over his personal calendar." (ECF No. 20 at 14). The record does support that Morgan had control of the calendar, as he testified that it was "[his] calendar," which he had the power to share with investigators and could choose not to. (Morgan Dep. 187:15-188:20). As to the duty to preserve evidence, the obligation to preserve may arise "'when a party should have known that the evidence may be relevant to future litigation.'" *Beaven*, 662 F.3d at 553. In order to assess whether this duty existed, the court considers any evidence that shows litigation was "probable" when the relevant evidence was destroyed. *O'Brien v. Ed Donnelly Enters.*, 2010 U.S. Dist. LEXIS 42271, at *9-10 (S.D. Ohio Apr. 29, 2010) (quoting *John B. v. Goetz*, 531 F.3d 448, 459

18

(6th Cir. 2008)). Defendants have not presented any evidence that Morgan knew or should have known he would be filing this action on September 2017. Given that the calendar was allegedly destroyed on or around May 2015 at the latest and Morgan's termination that gave rise to this action did not occur until September 2015, there was no reasonable expectation for litigation at the time the calendar was allegedly destroyed. (Morgan Dep. 13:20-21).

As to the second element, Defendants have not produced evidence to support their theory that Morgan destroyed the calendar with a culpable state of mind. A culpable state of mind requires a party destroyed the evidence "knowingly, even if without intent to breach a duty to preserve it, or negligently." *Adkins v. Wolever*, 692 F.3d 499, 504-05 (6th Cir. 2012) (quoting *Beaven*, 622 F.3d at 554). Morgan testified that he did not still possess the relevant calendar because he had "never" kept calendars. (Morgan Dep. 77:8-15). Defendants only make a conclusory statement that Morgan destroyed the calendar "with a culpable mental state" and repeat the record that Morgan did not know why he got rid of the calendar without offering countervailing evidence. (ECF No. 20 at 14).

Finally, as to the third element, the destroyed evidence must be "more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *One Beacon Ins. Co. v. Broad Dev. Group, Inc.*, 147 F. App'x 535, 541 (6th Cir. 2005) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002)). Essentially, this means "when the negligence of one party in destroying or losing evidence has undermined the ability of an opposing party to prove its case," then an adverse inference instruction is appropriate. *Id.* at 542. Negligence is tied primarily to notice of the evidence's relevance to litigation and the subsequent duty not to destroy it. *Id.* (citing *Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1988); *Rogers v. T.J. Samson Comm. Hosp.*, 276 F.3d 228, 233 (6th Cir. 2002)). In this case, the record does not

19

support negligence on Plaintiff's part, as he could not have been on notice for litigation whose underlying events had not yet occurred. Defendants contend that the calendar would be relevant to determining whether Morgan was working at Stratford Lakes when he was supposed to, but Morgan had not yet been terminated at or around the time the calendar was allegedly destroyed. Thus, there was no notice that this litigation would occur. Therefore, the calendar could not have been yet relevant at the time it was allegedly destroyed, and this element is not satisfied. Therefore, this Court concludes Defendants have not met their burden to win summary judgment as a sanction for Plaintiff's alleged spoliation.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  August 25, 2020**